JAMES D. BOYLE, ESQ.
Nevada Bar No. 08384
Email: jboyle@nevadafirm.com
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
Email: jlujan@nevadafirm.com
HOLLEY DRIGGS LTD.
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: (702) 791-0308

Frank D'Angelo (Pro Hac Vice Submitted)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
Telephone: (212) 407-4189
Email: fdangelo@loeb.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| HYBE CO. LTD. f/k/a BIG HIT ENTERTAINMENT CO. LTD., BIGHIT MUSIC CO. LTD. and HYBE AMERICA INC., | CASE NO.:   2:22-cv-00510-JAD-EJY |
| Plaintiffs, | **PLAINTIFFS' *EX PARTE* EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION; AND ORDER OF SEIZURE** |
| v. | |
| JOHN DOES 1-100, JANE DOES 1-100, and XYZ COMPANIES 1-100, an individual, | **(Oral Argument Requested)** |
| Defendants. | |

Pursuant to Fed. R. Civ. P. 65(a), LR IA 7-2, and LR II 7-4, Plaintiffs HYBE Co. Ltd. f/k/a Big Hit Entertainment Co. Ltd. ("HYBE"), BIGHIT MUSIC Co. Ltd. ("BIGHIT"), and HYBE America Inc. ("HYBE America") (collectively, "Plaintiffs"), by their undersigned attorneys, respectfully move this Court, on an *ex parte* and emergency basis, for a Temporary Restraining Order, and Order of Seizure, and thereafter a Preliminary Injunction Order, enjoining Defendants John Does 1-100, Jane Does 1-100, and XYZ Companies 1-100, their true identities being unknown, and all those acting in concert with defendants, from the unauthorized manufacture, distribution, sale or holding for sale, of clothing, photographs, posters, stickers, and other

merchandise bearing the registered trademarks, service marks, names, likenesses, logos and other indicia of the musical group known as BTS. Plaintiffs' bases for requesting emergency relief are set forth in the accompanying Declaration of Frank D'Angelo (the "D'Angelo Decl.") attached hereto and incorporated herein by this reference as **Exhibit 1**.

This Motion for Temporary Restraining Order, Preliminary Injunction; and Order of Seizure (the "Motion") is based up on the Memorandum of Points and Authorities set forth below, the accompanying D'Angelo Decl., Declaration of Thomas Donnell, attached hereto as **Exhibit 2** (the "Donnell Decl."); Declaration of Shin Young Jae, attached hereto as **Exhibit 3** (the "Shin Decl."); Declaration of Dylan Dae Woo Kim, attached hereto as **Exhibit 4** (the "Kim Decl."); the exhibits submitted therewith; and the oral argument of counsel. Plaintiffs hereby request oral argument on this Motion pursuant to LR II 78-1. Plaintiffs further attach a [Proposed] Order Granting Temporary Restraining Order; Order Granting of Seizure; and Order Setting Hearing on Preliminary Injunction as **Exhibit 5** (the "Order").

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The papers accompanying this Motion establish that bootleggers, and those acting in concert with them, have sold unauthorized, infringing, and counterfeit T-shirts, posters, and other merchandise ("Infringing Merchandise" or "Bootleg Merchandise") bearing the registered trademarks, service marks, images, likenesses, logos and other indicia (collectively, the "Trademarks") of the popular K-pop music group known as "BTS" (the "Artist") and will continue to sell such Bootleg Merchandise at and in the vicinity of the Artist's upcoming concert performances at Allegiant Stadium in Las Vegas, Nevada in April 2022 (the "Vegas Shows").

On April 8, 9, 15, and 16, 2022, at Allegiant Stadium, the Artist will perform concerts to sold out crowds of tens of thousands of fans. See D'Angelo Decl., ¶¶ 2, 11. BIGHIT owns the Artist's Trademarks and has conveyed to HYBE the exclusive right to exploit those Trademarks in connection with the production, distribution, and sale of various types of music-related merchandise. See Shin Decl., ¶¶ 2-3; Kim Decl., ¶¶ 2-3. HYBE has licensed the use of those Trademarks to its wholly-owned U.S. subsidiary HYBE America, which has contracted with

Merch Traffic ("MT") to distribute officially licensed merchandise bearing the Artists' Trademarks at Allegiant Stadium between April 7 and April 16.  See Shin Decl., ¶¶ 2-3; Kim Decl., ¶¶ 2-3; Donnell Decl., ¶¶ 1-2. HYBE America's affiliates will also sell officially licensed merchandise at temporary retail locations known as a "pop-up stores" that will operate in close proximity to Allegiant Stadium between April 5 and April 17.  See Kim Decl., ¶ 3.

Because Plaintiffs possess the exclusive right to the Trademarks, Defendant bootleggers can assert no defense to Plaintiffs' claims. Not only are the proceeds from each bootleg merchandise sale irretrievably lost to Plaintiffs and their licensees, which will operate official retail locations at and in connection with the Vegas Shows, but the damage to Plaintiffs' and the Artist's goodwill through the distribution of inferior merchandise cannot be calculated or remedied. The only way that these bootleggers can be stopped is through issuance of a temporary restraining order and order of seizure, followed by a preliminary injunction.

Plaintiffs and their licensees have already been victimized by bootlegging activity during the Artist's previous concert performances in 2018, 2019, and 2021 in Los Angeles, Chicago, and the New York metropolitan area. Starting at least as far back as concert performances on September 5 through 9, 2018 at the Staples Center in Los Angeles, several individuals associated with HYBE and MT witnessed bootleggers in the vicinity of the concert venue selling unauthorized Bootleg Merchandise, primarily consisting of t-shirts, posters, and other materials bearing the Artist's Trademarks. See Donnell Decl., ¶ 9, Ex. G.

In an effort to combat such activity in connection with concert performances scheduled to take place in Los Angeles County several months later, HYBE (then known as "Big Hit Entertainment Co. Ltd."), sought and obtained from the Superior Court of the State of California, Los Angeles County, a temporary restraining order and order of seizure, in connection with the Artist's concerts at the Rose Bowl in Pasadena on May 4-5, 2019. See D'Angelo Decl., Ex. B (Order to Show Cause on Motion for Preliminary Injunction with Temporary Restraining Order and Order of Seizure, Big Hit Entmt. Co. Ltd. v. John Does 1-100 et al., Case No. 19GDCV00547 (Cal. Super. Ct. May 2, 2019)). Acting under the authority of that Order, HYBE's authorized representatives, working with local law enforcement, seized 145 boxes of infringing Bootleg

Merchandise, including approximately 5,000 bootleg BTS t-shirts, from an unauthorized "pop-up" store in Pasadena on the day of the Artist's first Rose Bowl performance on May 4, 2019. See Donnell Decl., ¶¶ 6-7, Exs. C-E. That unauthorized retail operation was transparently designed to confuse prospective customers of legitimate and authorized tour merchandise being sold by official licensees nearby. See id., ¶ 6. In addition to those materials, 17 additional boxes of Bootleg Merchandise containing hundreds of infringing articles bearing the Artist's Trademarks, including unauthorized t-shirts, posters, photographs, and handheld fans were seized from the area immediately surrounding the Rose Bowl on May 4-5, 2019—all of which were visibly of an inferior quality to the official tour merchandise being sold at and around the concert venue by official tour merchandise licensees. See id., ¶ 8, Ex. F.

Several days after those Rose Bowl performances, HYBE, acting under the authority of a separate temporary restraining order and order of seizure issued by the U.S. District Court for the Northern District of Illinois, see D'Angelo Decl., Ex. C, seized an additional 65 infringing articles of unauthorized Bootleg Merchandise from bootleggers operating in the vicinity of the Artist's concert performances at Soldier Field in Chicago, Illinois and at MetLife Stadium in East Rutherford, New Jersey on May 11-12 and May 18-19, 2019, see Donnell Decl., ¶ 5, Ex. B.

Even more recently, bootleggers came out in full force in connection with the Artist's concert performances at SoFi Stadium in Los Angeles, California on November 27-28 and December 1-2, 2021, and HYBE's authorized representatives, acting under the authority of a temporary restraining order and order of seizure issued by the Los Angeles County Superior Court in November 2021, see D'Angelo Decl., Ex. A, seized four large boxes of unauthorized Bootleg Merchandise from over 40 bootleggers that were operating in the vicinity of the concert venue, see Donnell Decl., ¶ 4, Ex. A.

Given that such substantial bootlegging activity has already occurred in connection with the Artist's previous concert performances and pop-up stores, and based upon the immense popularity of the Artist—now one of the most commercially successful musical acts in the world with one of the most engaged and ardent fan bases in all of pop music—Plaintiffs and their representatives anticipate that the areas surrounding the upcoming Vegas Shows will once again

function as impromptu vending sites for bootleggers offering for sale Infringing Merchandise bearing the Artist's name, image, logo, and/or trademarks, which will effect pecuniary and reputational harm on Plaintiffs, their licensees, the Artist, and the public at large unless restrained by this Court. See id., ¶¶ 10-12; Shin Decl., ¶ 4; Kim Decl., ¶¶ 4-8.

It is evident from these recent experiences that the relief requested herein is the only method of protecting the public from inferior-quality merchandise which bears a false designation of origin, and protecting Plaintiffs from the damage to their and the Artist's goodwill that would be caused by the continued sale of Bootleg Merchandise. See Donnell Decl., ¶¶ 14-20. Such merchandise is created and sold by individuals accountable to no one, whether for payment of royalties, income or sales taxes, or for quality control. Thus, there is no potential harm to any legitimate interest of defendants or any other persons if the requested relief is granted. Accordingly, for the reasons stated below, the relief Plaintiffs seek is warranted under section 43(a) of the Lanham Act and Nevada statutory and common law.

<u>ARGUMENT</u>

I.   THE SALE OF "BOOTLEG" MERCHANDISE VIOLATES PLAINTIFFS' EXCLUSIVE RIGHTS.

Plaintiffs have the exclusive right to sell and license the sale of merchandise bearing the Artist's name, image and logos in connection with the Vegas Shows. The sale of counterfeit merchandise by defendants violates these rights and must be enjoined.

A.   Defendants Are Violating Section 43(a) of the Lanham Act.

The federal courts have repeatedly held that the use of registered and unregistered names, images and logos of musical artists by bootleggers violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). See App'x A hereto; D'Angelo Decl., Exs. C-T (previously-issued temporary restraining orders and preliminary injunction federal court orders); see also Winterland Concessions Co. v. Creative Screen Design Ltd., 214 U.S.P.Q. 188 (N.D. Ill. 1981) (sales of bootleg T-shirts bearing the names of various rock artists violates § 43(a) of the Lanham Act); Billy Joel v. Various John Does, 499 F. Supp. 791, 792 (E.D. Wisc. 1980) (sale of unauthorized T-shirts bearing the name of the artist Billy Joel violates § 43(a) of the Lanham Act).

Section 43(a) is designed to prevent a wide range of conduct involving both registered and unregistered names, images and logos. Section 43(a) provides in pertinent part:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which … is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). This broad prohibition against "unfair competition" covers not only confusion as to source or sponsorship between defendants' goods and Plaintiff's goods, but it also prohibits the misappropriation of the efforts of others. See McKenney & Long, Federal Unfair Competition: The Lanham Act, § 2:04 (1989). Section 43(a) codifies the principle articulated by the Supreme Court in Int'l News Service v. Associated Press, 248 U.S. 215, 239 (1918), that a party cannot "reap where it has not sown." See also R.H. Donnelley Corp. v. Illinois Bell Tel. Co., 595 F. Supp. 1202, 1206 (N.D. Ill. 1984) ("[t]hose who invest time, money and energy into the development of a product and its accompanying goodwill should be allowed to reap the advantages of their investment").

The elements of the claim for violation of Section 43(a) are: (1) that the mark is valid and protectable, and (2) that the defendant's use of the mark is likely to cause confusion among the consuming public. Two Pesos, Inc. v. Taco Cabana Inc., 505 U.S. 763, 769-70 (1992). The likelihood of confusion is determined by consideration of the following factors, articulated in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979):

> "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. Defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines"

Id. at 348-349; see Debell Windows Sys. v. Exteriors, Case No. 3:20-cv-00420, 2020 U.S. Dist. LEXIS 172057, at *17 (D. Nev. Sept. 21, 2020).

Judged by these factors, there is no defense to defendants' use of the marks at issue. The Artist's names, images and logos are strong protectable marks. Using the traditional scale of marks

from the generic to the arbitrary, Plaintiff's marks are arbitrary; they do not describe the goods to which they are attached. Thus, they are entitled to the highest protection. Defendant bootleggers will be copying these trademarks and images on infringing merchandise and selling such merchandise at the Artist's concerts. The same items—T-shirts and other clothing, accessories, posters, and other typical concert merchandise—will be offered for sale in the same areas on the same dates by both the Plaintiff and/or its licensees, on the one hand, and the bootleggers, on the other hand. Concert-goers will not "shop around," but will make purchases wherever convenient upon their arrival at and/or departure from the concerts, and in the vicinity of the pop-up shops where officially licensed merchandise will be sold. Moreover, where, as here, defendants are aware of the Plaintiffs' use of the mark, defendants' intent is presumed to be in bad faith. See Sleekcraft, 599 F.2d at 344 (deception may be presumed from the knowing adoption of a similar mark); see also Entrepreneur Media v. Smith, 279 F.3d 1135, 1148 (9th Cir. 2002) ("[w]here an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse."). Intentional copying of the Artist's mark renders a likelihood of confusion a certainty.

Defendants have manufactured bootleg merchandise for the sole purpose of selling it in the vicinity of the concert venue and official pop-up shops. It is beyond dispute that defendants have intentionally utilized, and will continue to intentionally utilize, the Artist's protected marks to deceive the public and create the appearance that defendants' Infringing Merchandise is sponsored by or originated with the Artist and Plaintiffs. This is precisely the type of conduct that Section 43(a) was designed to prevent.

B.   Defendants Are Violating The Right of Publicity.

Nevada's right of publicity statute, NRS §§ 597.770 et seq., precludes against any "commercial use" by another "of the name, voice, signature, photograph or likeness of" any natural person such as the Artist's members without prior written consent, including "the use of the name, voice, signature, photograph or likeness of a person on or in any product, merchandise or goods or for the purposes of advertising, selling or soliciting the purchase of any product, merchandise, goods or service." Id. §§ 597.770(1), 597.790(2); see id. § 597.800(1) (providing that "[t]he right

of publicity established by NRS 597.790 is freely transferable, in whole or in part, by contract [or] license"); <u>Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc</u>., 778 F.3d 1059, 1080 (9th Cir. 2015).

Here, Plaintiffs have the exclusive right to control the commercial value of the names and likenesses of the members constituting the Artist in connection with the sale of merchandise at the Vegas Shows and to prevent others from exploiting that value without permission. <u>See</u> Shin Decl., ¶¶ 2-3. Defendants' have used, and will continue to use, the names, images, and likenesses of the Artist on the counterfeit products themselves as well as in connection with their sale, for commercial purposes and without any permission from Plaintiffs. <u>See</u> Donnell Decl., Exs. F-G. Accordingly, every sale by the defendant bootleggers violates the right of publicity statute.

Plaintiffs have a strong likelihood of success on a right of publicity claim. The recordings and personal appearances of the Artist enjoy the highest commercial success and popularity. Moreover, the Artist and Plaintiffs have embarked on a controlled program of merchandising, including at concert venues and pop-up stores and through official online channels. The injunctive relief sought by Plaintiffs targets the unauthorized appropriation of these rights and the unauthorized application of the Artist's name and likeness to novelty merchandise.

C.    <u>Defendants Are Engaging in Unfair Competition</u>.

The common law prohibits unfair competition. <u>See</u> <u>Int'l News Ser. v. Associated Press</u>, 248 U.S. 215, 239 (1918) (a party cannot "reap where it has not sown"). In Nevada, common law unfair competition claims are "'substantially congruent' to claims made under the Lanham Act." <u>Group v. Jiangsu Longteng-Pengda Elec. Mech. Co</u>., Case No. 2:18-cv-00812, 2020 U.S. Dist. LEXIS 94803, at *28-29 (D. Nev. May 31, 2020) (quoting <u>Cleary v. News Corp.</u>, 30 F.3d 1255, 1262-63 (9th Cir. 1994)). Unfair competition is demonstrated where the defendant, without permission, uses the names or likenesses owned or licensed to a plaintiff. <u>See Bear Omnimedia LLC v. Mania Media LLC</u>, Case No. 2:17-cv-01478, 2018 U.S. Dist. LEXIS 179021, at *10-11 (D. Nev. Oct. 17, 2018) (stating that "[i]n Nevada, a common law unfair competition claim is the state equivalent of the federal Lanham Act claim," and sustaining common-law claim on same basis as "its federal counterpart" for trademark infringement); <u>A.L.M.N., Inc. v. Rosoff</u>, 757 P.2d 1319, 1321 (Nev. 1988) ("Common law tradename infringement falls within a broader category

- 8 -

of prohibited unfair competition. At the heart of [cases alleging] trademark infringement . . . are two questions: Has a protectable right been created? Has it been infringed?") (citation and internal quotation marks omitted). Accordingly, common law unfair competition is manifest in the instant case for the same reasons stated above in connection with Plaintiffs' Lanham Act claim.

II. <u>PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER, AN ORDER OF SEIZURE, AND A PRELIMINARY INJUNCTION.</u>

This action is aimed at bootleggers—groups of individuals who manufacture counterfeit merchandise and sell it whenever the Artist performs live. The only available remedy which can protect Plaintiffs and the Artist is injunctive relief, including an order of seizure.

A. <u>An Injunction and Order of Seizure Are Appropriate</u>.

As part of the injunctive relief sought, it is necessary to seize the subject goods manufactured, sold and/or distributed for sale by defendants in order to render complete relief herein, prevent irreparable injury to Plaintiffs due to defendants' conduct in counterfeiting these items, and prevent these items from being destroyed or transferred to parties outside this litigation.

Federal and state courts have repeatedly issued temporary restraining orders and orders of seizure, in advance of concerts, to stop the sale of bootleg merchandise. <u>See</u>, <u>e.g.</u>, App'x A hereto; D'Angelo Decl. Exs. A–T. This procedure is specifically authorized by statute. Section 44 of the Lanham Act, 15 U.S.C. § 1116, specifically provides for injunctions "upon such terms as the court may deem reasonable" to prevent the infringement of registered trademarks and violations of section 43(a). 15 U.S.C. § 1116(a); <u>see id.</u> § 1118 (a court has the authority to order delivery, seizure and destruction of merchandise which violates a registered trademark or section 43(a) of the Lanham Act); <u>id.</u> § 1114 (remedies for violation of registered trademarks also available for acts of unfair competition).

In virtually all of the cases cited herein where a wholly <u>ex parte</u> restraining order was awarded in the context of John Doe lawsuits, the courts have granted the ancillary remedy of seizure. For example, in <u>Big Hit Entertainment Co. Ltd. v. Various John Does, et al.</u>, Case No. 19-CV-03070 (N.D. Ill. 2019), HYBE (then known as "Big Hit Entertainment") sought an <u>ex parte</u> temporary restraining order and order of seizure against bootleggers selling T-shirts and other

garments bearing the Artist's trademark in connection with the group's concert performances in Chicago and East Rutherford, New Jersey. The court recognized that immediate and irreparable injury would ensue <u>before</u> defendants could be given notice and an opportunity to be heard and, therefore, authorized the United States Marshall, state and local police, HYBE's representatives, and/or others acting under HYBE's supervision to:

> seize and impound any and all Bootleg Merchandise bearing the Artist's Trademark which defendants, or those acting in concert with defendants, attempt to sell or are holding for sale in connection with any of the Artist's concert performances (including any carton, container, or other means of carriage in which the Bootleg Merchandise is found) from four (4) days before to one (1) day after any concert performance of the Artist, and within a ten (10) mile radius of any concert performance of the Artist[.][1]

D'Angelo Decl. Ex. C, at 3; <u>see id.</u> Exs. A-B (other <u>ex parte</u> orders issued in Plaintiffs' favor); <u>see also id.</u> Exs. D-T (examples of <u>ex parte</u> seizure orders issued by other courts).

Moreover, a seizure order should be granted under the traditional standard of Rule 65 of the Federal Rules of Civil Procedure, which permits the issuance of temporary restraining orders without notice where "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). In cases of trademark infringement and unfair competition such as this one, the fact that there is a likelihood of confusion constitutes irreparable injury as a matter of law sufficient to satisfy the requirements of Rule 65(b). *See* 15 U.S.C. § 1116 ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.").

---

[1] Plaintiffs here seek an injunction of a more limited temporal and geographic scope, namely from three (3) days before the performances begin until one (1) day after they conclude, and within a 5-mile radius of the concert venue. This more limited proposed order is narrowly tailored to the time period during which Plaintiffs and their licensees will be offering official merchandise for sale in connection with the Vegas Shows (April 5-17, 2022), as well as to the geographic area where they anticipate bootleg sales will occur and within which Plaintiffs and their licensees will operate the officially licensed pop-up stores.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Furthermore, defendant bootleggers' manner of operating renders inevitable the requisite "immediate and irreparable injury, loss, or damage" under Rule 65(b). As the accompanying Donnell Decl. details, bootleggers' sales of infringing goods at or near a musical group's concert venue result in two primary forms of injury to the musical group and its licensees:

> First, the bootleggers are not bound by contract to provide first quality apparel and graphic designs, as is required of licensed merchandisers.  The musical group's fans suffer because they are buying inferior imitation goods which rarely "last" very long. The fans are disappointed and, in their confusion as to the source of the merchandise, blame the artists and the licensed merchandisers. This adversely affects future legitimate sales and tends to create a negative feeling by the fans directed against the artists and merchandiser, which in turn results in decreased record sales and concert attendance.

> Second, with no obligation to pay royalties to the artist, and because they do not pay any part of their gross sales receipts to the concert venue, the bootleggers can drastically undersell the legitimate merchandiser. This ability to undersell the legitimate merchandiser is enhanced by the fact that bootleggers do not collect or pay sales or income taxes. In short, bootlegging results in severe economic harm to the Artist, the Plaintiffs and the public.

Donnell Decl., ¶¶ 17-18; see D'Angelo Decl., ¶ 14 ("Absent the relief requested, . . . the loss of merchandising income at even a single concert performance could amount to tens of thousands of dollars. This damage is compounded by the injury to the goodwill of the Artist and Plaintiffs through the distribution of inferior merchandise, which inevitably is associated with the Artist and Plaintiffs.").

As one federal court acknowledged in granting an ex parte temporary restraining order in connection with sales of bootleg Billy Joel merchandise at one of the musical artist's Milwaukee concerts, "Obviously, the presence of the unauthorized vendors outside the concert halls hurts the sales of [the licensing company's] merchandise and damages Billy Joel who receives a percentage of such sales." Joel, 499 F. Supp. at 792; see Mode Media Corp. v. Doe, No. 3:16-cv-00244-RS, 2016 U.S. Dist. LEXIS 5493, at *3 (N.D. Cal. Jan. 15, 2016) (granting ex parte application for TRO pursuant to Rule 65 and Lanham Act precluding use of domain name related to confusingly similar website, and stating "[Plaintiff] has also demonstrated a likelihood of confusion tends to cause trademark holders to lose control of their business reputation and good will"). Absent

1   injunctive relief in advance of the bootleg sales, those sales will occur and the defendants will

2   disappear, making it impossible to remedy this ongoing violation of Plaintiffs' rights.

3          The irreparable harm from defendants' selling and distribution activities is manifest from

4   the supporting declarations. Because the defendants have the temerity to conduct blatantly

5   unlawful activities, making a business of selling infringing articles, and have an economic interest

6   in continuing their unlawful actions, there is no reason to believe they will voluntarily stop.

7   Providing relief to Plaintiffs without notice to defendants is necessary to ensure that defendants do

8   not evade this court and continue their infringing activities elsewhere. For example, in Matter of

9   Vuitton et Fils S.A., the U.S. Court of Appeals for the Second Circuit acknowledged that complete

10  injunctive relief must be accorded to parties who face the anomaly whereby the products subject

11  to the injunction may be transferred or destroyed prior to the enforcement of the injunction by a

12  court of competent jurisdiction. 606 F.2d 1, 4 (2d Cir. 1979) ("The ex parte temporary restraining

13  order is indispensable to the commencement of an action when it is the sole method of preserving

14  a state of affairs in which the court can provide effective final relief. Immediate action is vital

15  when imminent destruction of the disputed property, its removal beyond the confines of the state,

16  or its sale to an innocent third party is threatened. In these situations, giving the defendant notice

17  of the application for an injunction could result in an inability to provide any relief at all.") (citation

18  and internal quotations omitted).

19         Similarly, the Ninth Circuit, citing Matter of Vuitton et Fils, has acknowledged that an ex

20  parte temporary restraining order is appropriate where "an alleged infringer is likely to dispose of

21  the infringing goods before the hearing." Reno Air Racing Ass'n v. McCord, 452 F.3d 1126, 1131

22  (9th Cir. 2006); see SATA GmbH & Co. KG v. Wenzhou New Century Int'l, No. CV 15-08157-

23  BRO (Ex), 2015 U.S. Dist. LEXIS 147637, at *15-16 (C.D. Cal. Oct. 19, 2015) (granting ex parte

24  TRO where notice would render further prosecution fruitless even though plaintiff did not offer

25  evidence showing that alleged infringer had history of destroying evidence or violating court

26  orders, because plaintiff provided evidence that similarly-situated California defendants in

27  trademark infringement cases have ignored orders to preserve evidence upon court's denial of ex

28  parte TRO and brought to court's attention the "bourgeoning case law around the country which

have recognized and approved as both appropriate and necessary judicial relief [] granting of temporary restraining orders without notice….") (citation and internal quotations omitted); see also, e.g., Vuitton v. White, 945 F.2d 569, 571 (3d Cir. 1991) ("Consistent with their calling, professional counterfeiters and dealers in counterfeit goods generally are not upstanding citizens. This presents a major obstacle to trademark owners trying to protect their marks. As one commentator has described the situation, '[e]xperience … has shown that it is extremely likely that a counterfeiter, upon [receiving notice] … will conceal his infringing merchandise and either destroy or conceal all records relating to this merchandise ….'") (citation omitted); Burdette v. Garnatti, No. 06-CV-445-JPG, 2006 U.S. Dist. LEXIS 39585, at *3 (S.D. Ill. June 15, 2006) ("[T]he Court may appropriately grant an ex parte TRO when the petitioner demonstrates to the Court that the adverse party, if notified of the impending action, would take steps to damage the petitioner's interest.").

B.   A Temporary Restraining Order, Without Notice, Is Available to Enjoin Activities of Persons Whose Identities Are Unknown.

As explained in the accompanying D'Angelo Decl., Plaintiffs should not be required to provide formal notice to defendants for the independent reason that, as a practical matter, defendants cannot positively be identified until the time at which they are engaged in their unauthorized and illegal activity and they are actually served with a copy of the Complaint and the Court's Order. See D'Angelo Decl., ¶¶ 16-17. As a general rule, individual bootleggers are well aware of the illegal nature of their activities and therefore conceal their presence and intentions until just prior to the show, making it even more difficult, if not impossible, to identify and provide notice to defendants prior to the Vegas Shows. Id., ¶ 16. Indeed, the identities of the individual bootleggers will not be known until they are stopped and the goods seized, and even then the bootleggers often refuse to provide their true identities.  Id., ¶¶ 16-17.

This is precisely why in each of the cases cited in Appendix A hereto and annexed to the D'Angelo Decl., the action was commenced against John and Jane Doe defendants and a temporary restraining order and seizure order was issued. For example, as the court stated in Moon Records v. Various John Does:

> The problem regarding the identity of defendants will be met by requiring copies of the complaint and this restraining order to be served upon all persons from whom infringing merchandise is seized on [the dates in question].  These persons will be asked to reveal their names so that they can be added as parties to the lawsuit and appear in court to contest the seizures at the hearing . . . .

217 U.S.P.Q. (BNA) 46, 47 (N.D. Ill. 1981); accord Joel, 499 F. Supp. at 792.

As noted above, Rule 65(b) of the Federal Rules of Civil Procedure authorizes this Court to grant a temporary restraining order coupled with an order of seizure without notice against unidentified defendants, where—as here—"immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A); see supra Section II.A. Moreover, the Lanham Act specifically contemplates that a TRO and seizure order against infringing merchandise may be had on ex parte application. 15 U.S.C. § 1116(d) authorizes an ex parte restraining order where, in addition to the traditional requirements for injunctive relief, an order other than an ex parte seizure order is not adequate, the applicant has not publicized the requested seizure, and the person against whom seizure would be ordered would destroy or otherwise make inaccessible to the court the infringing materials. 15 U.S.C. § 1116(d)(4)(B).

Here, the only effective remedy is an ex parte TRO and seizure order. As explained above, even if the identities of some of the bootleggers could be obtained, they should not be given notice of the seizure because they likely would conceal or destroy the Bootleg Merchandise and all other evidence of their infringing activities, including any evidence which would disclose the identity of their suppliers and other persons acting in concert with them. See D'Angelo Decl. ¶¶ 18-19. An ex parte order from this Court enjoining further infringing conduct and authorizing the seizure of defendants' Bootleg Merchandise will permit Plaintiffs to prevent the sale of such merchandise and to obtain important evidence, including (i) evidence of defendants' unlawful competition and violation of Plaintiffs' rights of publicity and privacy; (ii) evidence to establish defendants' unlawful earnings (e.g., books and records); and (iii) evidence of the persons and entities supplying and acting in concert with Defendants. Id., ¶ 18. Ultimately, the supporting declarations

demonstrate that granting the temporary restraining order and order of seizure is not only appropriate, but imperative in order for Plaintiffs to obtain any real remedy.

C.      The Threatened Injury to Plaintiffs Outweighs Potential Harm to Defendants.

Plaintiffs have sufficiently proven imminent irreparable harm due to defendants' sale of their Infringing Merchandise which bears the Artist's Trademarks, and that Plaintiffs have no control over the Infringing Merchandise or its quality. Accordingly, Plaintiffs will suffer a loss of goodwill due to sales of inferior Infringing Merchandise. These peddlers appear at each venue, and rarely have identification and/or keep records of their sales. See Donnell Decl., ¶¶ 17-18; SKS Merch, LLC v. Barry, 233 F. Supp. 2d 841, 847 (E.D. Ky. 2002) ("Plaintiffs have independently established that they will be irreparably harmed absent an [sic] Preliminary Injunction enjoining the sale of bootleg merchandise related to [Toby] Keith throughout the nation."). Plaintiffs have also demonstrated that the threatened injury to Plaintiffs outweighs the potential harm to the defendants. See Hard Rock Cafe v. Pacific Graphics, Inc., 776 F. Supp. 1454, 1463 (W.D. Wa. 1991) (valuable "'Hard Rock Café'" logo symbolizes the goodwill connected with [plaintiffs] business, and that goodwill should not be jeopardized by placing it in the hands of [defendants].") Any inconvenience to the defendants will be merely economic, consisting primarily of lost profits from their unlawful distribution of the Infringing Merchandise. Critically, the proposed Order prohibits the sale, and authorizes the seizure, of only merchandise which violates the Trademarks and publicity rights of Plaintiffs and/or the Artist, and Plaintiffs will be required to post a bond to cover any damages which may be incurred in the unlikely event that any party is wrongfully restrained.

///
///
///
///
///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CONCLUSION</u>

Based on the foregoing, Plaintiffs respectfully request that their application be granted.

DATED this <u>23rd</u> day of March, 2022.

**HOLLEY DRIGGS LTD.**

*/s/ James D. Boyle*
JAMES D. BOYLE, ESQ.
Nevada Bar No. 08384
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

LOEB & LOEB LLP

Frank D. D'Angelo, Esq. (*Pro Hac Vice Forthcoming*)
345 Park Avenue
New York, New York 10154

*Attorneys for Plaintiffs*

13601-02/2725533.docx

**TABLE OF EXHIBITS**

| Exhibit: | Description: |
| --- | --- |
| 1 | Declaration of Frank D'Angelo |
| A[i] | Copy of Injunction Issued: *HYBE Co. Ltd. f/k/a Big Hit Entertainment Co. Ltd. et al.  v. John Does 1-100 et al.*, Case No. 21AHCV00077 (Cal. Super. Ct. Nov. 17 2021) |
| B | Copy of Injunction Issued: *Big Hit Entertainment Co. Ltd. v. John Does 1-100 et al.*, Case No. 19GDCV00547 (Cal. Super. Ct. May 2, 2019) |
| C | Copy of Injunction Issued: *Big Hit Entertainment Co. Ltd. v. Various John Does et al.*, No. 19-CV-03070 (N.D. Ill. 2019) |
| D | Copy of Injunction Issued: *Live Nation Merchandise, Inc. v. John Does 1-100, et al.*, Case No. 18-CV-7551 (S.D.N.Y. 2018) |
| E | Copy of Injunction Issued: *CTR Touring v. Rickey Robertson, et al.*, Case No. 17-cv-2939 (N.D. Ill. 2017) |
| F | Copy of Injunction Issued: *Leidseplein Presse, B.V., f/s/o "AC/DC" v. Various John Does, et al.*, Case No. 16-CV-2031 (N.D. Ill. 2016) |
| G | Copy of Injunction Issued: *Leidseplein Presse, B.V., f/s/o "AC/DC" v. Various John Does, et al.*, Case No. 08-CV-6047 (N.D. Ill. 2008) |
| H | Copy of Injunction Issued: *Steerpike Productions, Inc. v. John Does 1-100, et al.*, Case No. 07-02989 (N.D. Cal. 2007) |
| I | Copy of Injunction Issued: *Pearl Jam, L.L.C. v. John Does 1-100, et al.*, Case No. 06-2633 (N.D. Ill. 2006) |
| J | Copy of Injunction Issued: *RST (2005), Inc. v. Casey, et al.*, Case No. 05-11680 (D. Mass. 2005) |
| K | Copy of Injunction Issued: *Paisley Park Inc. v. Various John Does, et al.*, Civ. A. No. 2004-CV-2067 (C.D. Ill. 2004) |
| L | Copy of Injunction Issued: *Linkin Park LLC d/b/a Linkin Park Merchandising v. John Does 1-100, et al.*, Case No. CV-04-0112 (E.D.N.Y. 2004) |
| M | Copy of Injunction Issued: *Pearl Jam, L.L.C. v. John Does 1-100, et al.*, Case No. CV-03-203J (E.D.N.Y. 2003) |
| N | Copy of Injunction Issued: *Linkin Park LLC d/b/a Linkin Park Merchandising v. John Does 1-100, et al.*, Case No. 02-C-0762 (N.D. Ill. 2002) |
| O | Copy of Injunction Issued: *RST Concerts, Inc. v. John Does 1-100, et al.*, Case No. 02-11706 (D. Mass. 2002) |
| P | Copy of Injunction Issued: *Viking Wizard Eyes, Inc. p/k/a Blink-182 v. Various John Does*, Case No. 01-C-5053 (N.D. Ill. 2001) |
| Q | Copy of Injunction Issued: *ABB Merchandising Co., Inc. v. John Does 1-100, et al.*, Case No. 01-CV-2108 (S.D.N.Y. 2001) |
| R | Copy of Injunction Issued: *Poo Poo Butt, Inc. v. Various John Does, et al.*, Case No. 00-04707 (C.D. Cal. 2000) |
| S | Copy of Injunction Issued: *H.O.R.D.E Corp. v. John Does 1-100, et al.*, Case No. C-97-20587 (N.D. Cal. 1997) |
| T | Copy of Injunction Issued: *360 Degree Shootout, Inc. v. John Does 1-100, et al.*, Case No. CIV-S-97-0584 (E.D. Cal. 1997) |

13601-02/2725533.docx

| 2 | Declaration of Thomas Donnell |
|---|---|
| A | Copies of returned summonses reflecting service of process on bootleggers in connection with concert performances at SoFi Stadium in Los Angeles, California, from November 27-28 and December 1-2, 2021, and identifying items seized in conjunction therewith |
| B | Copies of returned summonses reflecting service of process bootleggers in the vicinity of concerts at Soldier Field and MetLife Stadium on May 11-12 and May 18-19, 2019, and identifying items seized in conjunction therewith |
| C | Photographs of an advertisement of an unauthorized retail store purporting to sell "official licensed products" |
| D | Copy of a packing list provided by the operators of the unauthorized store, identifying bootleg merchandize |
| E | Copies of photographs showing examples of seized bootleg t-shirts and photographs capturing the seizure undertaken by MT and local law enforcement |
| F | Copies of photographs showing examples of bootleg merchandise seized from the area immediately surrounding a concert venue |
| G | Copies of photographs reflecting bootleg activity in the vicinity of Staples Center in connection with concert shows |
| 3 | Declaration of Shin Young Jae |
| 4 | Declaration of Dylan Dae Woo Kim |
| 5 | [Proposed] Order Granting Temporary Restraining Order; Order Granting of Seizure; and Order Setting Hearing on Preliminary Injunction |

---

[i] Lettered exhibits are attached as exhibits to the respective declarations (Exhibits 1 and 2 to this Motion).

13601-02/2725533.docx